The next case on our call this morning is Agenda No. 20, Case No. 105-050, Marjorie O'Casek as Special Administrator v. Children's Home and Aid Society of Illinois. Ms. Lischer, are you ready to proceed? Yes. All right, you may proceed. Good morning, Your Honors, Counsel. My name is Nancy Lischer, and I represent OSF Healthcare and Dr. Castillo. The facts in this case are pretty straightforward. The plaintiff filed a medical malpractice action, asked for an additional 90 days in the face of a statute of limitations. While the suit was pending, she consulted with a physician. We don't have that report in the record. But what we do know is that two weeks later, she voluntarily dismissed. A year later, she filed again without a certificate of merit. The affidavit said, I need another 90 days. It did not say that the case had not been voluntarily dismissed. And at this point, it was a full three years since the claimed malpractice. Now, the statute that had been enacted, enrolled, and on the books for years, since 1998, provided that the affidavit had to say there was no prior voluntary dismissal, which did not permit that additional 90-day extension. Defendants moved to dismiss. The plaintiff opposed on a single basis, equal protection. It did not, the plaintiff did not urge for a change in the law. Instead, at the hearing, when asked directly by the trial court, the plaintiff said, yes, you have two options. Dismiss this case on the motions to dismiss which raise statutory construction or find it unconstitutional. The trial court dismissed the case. On reconsideration, the plaintiff started raising new issues. And five months after the dismissal, the plaintiff took back its agreement that this statute applied. The defendants opposed because these issues were raised belatedly and the plaintiff did not have a reasonable excuse. The trial court denied reconsideration and, of course, the appellate court reversed. Ordinarily, this case would be pretty routine. I think it's straightforward. It would involve statutory construction and it would also involve the equal protection clause. But I believe that what makes this case extraordinary is the appellate court's holding. The first issue I'd like to address briefly today is the fact that the plaintiff expressly forfeited and abandoned any challenge to this statute except for equal protection. The appellate court treated this as if it were an issue of waiver, and then said, well, this doctrine isn't binding on the courts. But I submit, based on this record, it was more than just waiver. It was express forfeiture and abandonment of all issues at that point. This court has recently reiterated that one of the two most important tasks that a reviewing court has is to determine what issues, if any, have been forfeited. And while identification of forfeited issues might seem mundane, I submit it's critical to the judicial process. It promotes judicial economy, efficiency. But I would also submit what it prevents is a court from taking an advocate's role on issues where the attorney, who is supposed to be the advocate, has chosen not to raise an issue. And, of course, it promotes finality in litigation. Thus, there's only one issue that the plaintiff preserved for review, and that is equal protection. Your Honors, you have repeatedly upheld the constitutionality of 2-622, and that issue has been fully briefed. If there are no questions on it, I'd like to move to my next point. Ms. Lisher, the only thing on the forfeiture waiver issue, apparently the appellate court probably ignored that because you would agree there's currently no consensus among the trial and appellate courts concerning whether Public Act 90-579 version of Section 2-622 applies, right? I mean, there are decisions all over the place. I would submit that there's one trial court decision in Cook County, and I believe the Beauchamp case in the 1st District follows Cargo. So, really, Ocasic is the first time that you had a break from that precedent. And I would submit, Your Honor, that the 4th District, since then, has come out with the Kroll case, and it said, we're overruling Ocasic, so I think you have a 4th District that's perhaps divided, but that the courts generally in Illinois, at least the reviewing courts, up until Ocasic, were consistent. This Court need not go past any other issue except forfeiture and equal protection to reverse the appellate court and to affirm the trial court. Another point I'd like to make, Your Honors, is the fact that after failing to identify all the forfeited issues, the appellate court then faced decades of established principles on statutory construction. It faced this Court's decision in Delgado that says the standard of review of rulings on motions to reconsider is abuse of discretion. And to get around these dilemmas, the majority found there was a new development since Cargill, which had been the precedent in the 4th District, was decided. And it looked to a 2005 amendment and said, well, there's a parenthetical in here. This establishes what the legislative intent was seven years ago. And it says that this parenthetical proved that the language of the 1998 or tort reform language had disappeared with best and was never resurrected. There is, of course, a faulty premise to this argument because the legislature doesn't place these parentheticals. It does not indicate legislative intent. It's an informational note placed by the Legislative Reference Bureau. The appellate court's reliance on this subsequent amendment to establish the legislative intent raises a whole host of issues, including the fact that in 1998 the General Assembly was different than the one sitting in 2005. It also, the appellate court also, or a majority of the 4th District decision, failed to give effect to the plain words of the 2005 amendment, which expressly said, oh, no, this only applies to cases that are filed after the effective date, which was August of 2005. And finally, it raises separation of powers concerns, among other issues. If this Court has no questions on those issues, then I will defer to Co-Counsel, who will be addressing the statutory construction issues. Thank you. May it please the Court. My name is Christopher L. Nowida, and I represent Dr. Emerson in this case. The bottom line basis for the Okasik majority's decision is simply this, that according to the subsequently enacted statute, 2005, the civil reform language disappeared with Best and was never reenacted. This holding, a two-to-one holding, basically eviscerated the Cargill decision. It reversed the trial court's decision in which we were allowed our motion to dismiss and also reversed the lower court's decision to deny the motion to reconsider. This was all in spite of the fact that we had Cargill, that Cargill was the same fourth district, that Cargill had the same identical statute, that Cargill dealt with the same identical facts, and that it's quite clear in looking at Cargill that the Court very clearly went through all of what they needed to do at that time to come to its decision. The Cargill case has never been reversed by this Court. It has been cited with favor with the Beauchamp case referenced earlier. This case, this Court in Okasik, in spite of the rules of statutory construction as well, which clearly favor the plain intent of the statute, and on top of it all, this statute was on for seven full years before the Okasik decision came through. And then what may have been the final thing is the Okasik decision actually, in essence, overruled its own decision in Cargill. The effects on our legal system, and I've referenced this in the brief, the effects of the legal system and how we do things could be extraordinarily changed by this decision. The ripple effect has already been felt with our, with the Krull decision that was issued approximately four months ago by this Court. And it was this same fourth district that looked at the whole thing again and actually, in essence, overruled the Okasik majority. The majority's decision and its thought process needs to either be confirmed as the law of the land or rejected. At the moment, we likely have a number of courts, one included as our lower court in McLean County. We likely have a lot of litigants who still may be dealing with this question, scratching their head, confused, because what we might be having here is not a ripple, but what we may have is a wave. If we analyze the majority's decision, it's clear that it was simply using the subsequently enacted statute in 2005 to interpret the earlier statute in 98. Judge Kinect, in his dissenting opinion, which is only one page long, but it said, during this time frame, between 98 and 2005, the law required an affidavit for a 90-day extension, along with a statement on the, that the case had not been voluntarily dismissed. But the Okasik majority said, no, the legislation after the legislation in question did not intend for the statute to be what it was seven years prior. And so we should use this next statute. The majority, in essence, overturns what we understand and what I've understood for years to be the law, and that is when you have a, you cannot use a subsequently enacted statute to determine legislative intent if the statute is, unless it's ambiguous or unless it has an absurd result, none of those are effective here. Counsel has admitted such in his brief. In essence, because the Okasik majority believes there was some type of error with the statute on which multiple cases have been determined, then the Okasik majority believed they needed to do something, they needed to rectify the problem. And we learned that at the time of the appellate court argument when it was suggested to me by one of the counsels that this entire period of time was a hoax, which, of course, I did not agree with. The problem, however, that the Okasik majority had was it had to fight through Cargill, it had to fight through case law on the subject, it had to fight through the statutory constructions that we all use in order to come down to the decision that it did. The Okasik majority would have us believe, in essence, that the statute never existed. And that is what my opponent has said in their brief as well. If the law never existed, then we've got the Cargill court, we've got Beauchamp, we've got Gielgud, which is one that was done earlier than Cargill, and now we've got Kroll all looking at this statute back in 98, which apparently never existed. Dissenting Judge Connacht stated again, and this is a very simple point, but I think it's very poignant, that even if there were a mistake, even if there were a mistake, it was the law of the land for seven years, and you can't go back now and undo the law as if it didn't exist. Interestingly, the Okasik majority does give credence to stare decisis, of course. They do cite with approval statutory construction. But to come again to its conclusion, it needed to go through the roadblocks of Cargill and its progeny. It also had to deal with just how are we going to get to that bottom line. So it said, well, the Cargill decision was done before the 2005 amendment. And so the Cargill court couldn't have known what was going to happen. That's completely flawed logic, in my opinion, with due respect to the court. And that is, that's assuming the Cargill court would do that, that they would look at the 2005 statute and then determine from it what really was occurring back in 98. And that's exactly what Judge Connacht is saying shouldn't have been done. And that's the other side of this. Practically speaking, Judge Connacht wouldn't have done it. We know that since he has ruled in Cargill. And then subsequent to that, he has agreed in Kroll and he has disagreed in Okasik. So what we've got here is that the majority has in essence created a new rule of statutory construction and we know that that cannot be, that it is the judiciary that determines what the legislature has said. This must be the job of the judiciary and this must be confirmed. I've thought a lot about this case and I do believe that it's almost as big, if not bigger, in issues, not only because of my client, Dr. Emerson, of course, who I represent, but the question must be here, how are we going to construe statutes in the future? And do we in the future use stare decisis as the law of the land? I'm asking this court, we are asking this court to overturn the Okasik majority. We're asking that the court affirm the lower court's decisions with respect to the dismissal of the case and with respect to the motion to reconsider, to return our system to where it should be. Thank you, Mr. Tancredi. Good morning, your honors. I'm Nicola Tancredi, representing Marjorie Okasik, Special Administrator for the State of Carla Thompson. Your honors, I have but a few comments. I don't anticipate taking my full 20 minutes unless there are questions from the court. Before I begin, I would like to express on behalf of Carla Thompson, her family and my office, the appreciation for appearing before the court today. I would also, if I could ask for a small indulgence for the court, express the appreciation of Illinois Attorney Mary Brady, my colleague and my wife, who is particularly grateful that I'm here today as I was otherwise committed to a sports-related expedition in Nevada. May it please the court, nothing that the defendants have said, nor anything they could say, could possibly justify letting stand the application of a law that in truth and in fact never existed. The reasons for that finding and the support for that finding are expertly and excellently addressed by Judge Cook in his decision and Judge Ward, and there are only a few comments that I can make that would assist the court in reviewing that analysis. In preparing for argument today, your honor, I did a particularly detailed timeline, which I think is useful for the court to consider. The Senate Bill 120, which was the initiation of what was later public law, 95-79, was well on its way in 1997. The best decision was issued on 12-18-97. Common sense and human experience tell us that the government is focused on a number of things during the Christmas, Hanukkah, New Year season, but not necessarily on the advanced case sheets from this court. To the credit of the Illinois legislature, Bill 579 was addressed and passed by the Senate on January 29, 1998, and we know that because of the testimony of its sponsor, Senator Lisa Madigan, who affirmed its sole purpose was to add NAPPERPATH to the bill. We know that the bill was also considered in February 4, 1998, because of the testimony of Representative Burke, who also confirmed, and this is February 98, the best decision having just been passed December 18. Representative Burke again notes the sole purpose is to add NAPPERPATH. The bill is passed February 4, 1998. So again, what we have is a very tight timeframe. The best decision being issued in the middle of December, the bill being passed in February, and I think that, as we look back now with the clarity of hindsight, gives some explanation. Is the language of that law, is that ambiguous? 9579, is it ambiguous? The text itself is not ambiguous, Your Honor, nor is the writing itself ambiguous when read in the context of the statute on statutes, which clearly indicates that change portions are to be italicized. And as both Judges Cook and Ward indicate, when read in that context, there is a seamless construction or seamless interpretation of 622 as having added only NAPPERPATH. And so that clearly is the writing that is clearly what the legislator intended, and as noted by... You do, Your Honor, when it is clear from the manifest weight of the evidence, if not clear and compelling evidence, that all the legislator intended was to add NAPPERPATH. Do we get to intent if we look at the statute in its plain, meanings plain? Yes, Your Honor, if it's clear that what has been applied is a statute which the legislatures did not intend, and I would ask the court to take... What import, Mr. Tancredi, does the fact that the best case found the core provisions of 89-7 unconstitutional and voided the entire act on the principle of severability? And specifically, this court invited the legislature to reenact those portions of the public act that were not held unconstitutional, and section 2622 was not specifically held unconstitutional, but was instead held unconstitutional on principles of severability. Should we... I mean, we don't have to go into the legislative intent to look at our own case law that indicates that the only reason 2622 was out of the box was on principles of severability. So why is it unclear to us that the legislature maybe would add NAPPERPATH, but would have no problem in the provision that included this voluntary dismissal situation? Your Honor, the legislative history is clear that the legislative intent was just the opposite. There's absolutely no evidence as required. Well, there's the words. That's what Justice Garmon's saying. How do we get past the clear language to get into this legislative intent, especially, as I said, when we've got the best case that doesn't even overrule that provision for any other reason than severability? But it was overruled, though, Your Honor, and as such, the entire law was declared void. The statute on statute says that reenacted provisions are to be so identified. As noted by Judge Cook and Ward, here was an attempt to comply with Article 480 and provide a context. Now... What significance does the enrolled bill doctrine have to this argument? I cannot address that, Your Honor. I think it's extremely significant, Your Honor, that my colleagues have not mentioned the U.S. Bank case as addressed in the pleadings. And I strongly argue against the contention that all that was done here was to look to the 2005 legislation. To U.S. Bank, that was a repeal by implication. Isn't that correct? That is correct, Your Honor. This is not a repeal by implication. No, Your Honor, but we think the principles are the same, and the key principle to which we direct the Court's attention respectfully, Your Honor, is that if the legislature seeks to reenact a provision which has been expressed, there must be evidence of that express intent, either in the language of the legislation itself or in the legislative history. And what is decisive here, Your Honor, is that in this case there is neither. There is absolutely not once until of evidence and no indication, either in the language of the statute itself or the legislative history, of the express intent which is intended to be disposed of. Your Honor, the other matter which I think is useful is to look at the time frame surrounding the motions to dismiss. The Carhill case came at the end of 2004. Motions to dismiss were filed in February and March and were decided in April. This was truly a legal research nightmare, Your Honor. We put tremendous resources on it. We would like to feel that we're relatively proficient in that, having had the privilege of serving on the editorial board of our law review. But this was a rat's nest, and there was confusion. I would ask the Court to take judicial notice of the fact that the versions of 622 published by a number of publications, including those by West, did not reflect the tort reform language. I had the honor of apprenticing under Edward Bradley Sr. 32 years ago, Your Honor, and as a discipline we check the statutes before we submit them for proof that the version that we checked did not contain the tort reform language. And in fact, I think if the Court would check, they would see that there were versions of 2004 that did not reflect that, because the interpretation was that tort reform had been rejected by the Court in Best. In terms of public policy considerations, such as the waiver issue, we certainly note, as addressed in the pleading of the Court's decision in Ray v. State of Funk, that limitations of waiver are on the parties and not the Court. The Court, to provide a just result and maintain a sound body of precedent, obviously has the ability to do justice. Is it appropriate for us to consider that this case was overruled later by the 4th District in Carroll? It was not overruled, Your Honor. We believe that that language was nothing more than dicta. And the Court so admitted that its ruling on Car-Hill, or excuse me, its ruling as to Okasik was not necessary, and the Court admitted in that decision that Okasik was distinguishable. And it basically, if one reads the decision closely, as I'm sure the Court has, it notes that the appellate court said, in the alternative, if the case is not distinguishable, then we would hold it overruled. Given that, Your Honor, it's And wrong with some understanding, as the, again, the legislative history in the course of events here were very complicated. Consider the fact that the Car-Hill decision created a legislative train wreck, which resulted in 900 cases, 1,900 motions to dismiss, consolidated in front of Judge Ward, and disposed of as far as Cook County. I had the good fortune to be in As far as equal protection goes, Your Honor, it's worth noting that what we are focusing on is the fact that it is an illegal discrimination to deny medical malpractice plaintiffs the rights afforded every other plaintiff by voluntary dismissal. There is no logical nexus between denying the medical malpractice plaintiff the same right of every other plaintiff in a following a motion for voluntary dismissal, which is a complete start over. And there is no You would admit that issue is not before us because there was an amendment in 2005, right? We're here because your complaint was filed, what, in 2002.  pre-1995 statute, right? I'm sorry, Your Honor, I don't follow that question. Well, 94-677 Public Act, that was in 2005. Am I correct on that? Yes, Your Honor. No, that's correct, Your Honor. So we're just looking at what statute would apply to your case, right, this period of time. Oh, that's correct, Your Honor. I was talking about the equal protection argument. I don't think we're talking about the same thing, Your Honor. I apologize. Okay. Right. But lastly, Your Honor, in terms of evaluating the public policy on this issue. Again, just to clarify, I was just talking from public policy purposes, which I thought you were getting into, what you were relating really has been, in your opinion, corrected with the amendment in 2005, right? No. No, Your Honor, I don't believe that the amendment of 2005 corrected. It went back to prior to 2005. I don't believe that the amendment of 2005 corrected. It went back to prior to 2005. I don't believe that the amendment of 2005 corrected. It went back to prior to 2005. Again, if one looks at what was underlined and what was italicized in the 2005 legislature, it is clear that the Illinois legislature was saying, this is the law as we understand it to be. And any other understandings are someone else's mistake, but certainly not ours. Again, Your Honor, to cut down to exactly what happened here, during the rush of the holiday season, someone made an interpretation and application of the responsibilities under Article 4 8D to provide a proper context. Now maybe this, given all of the judicial resources that have been expended on this train wreck, maybe there's some type of systemic correction that's necessary. Maybe there needs to be some automatic communication or red flag to the legislature when a law is overruled by this court. But clearly what happened here is that during the rush of that holiday season, there was an interpretation and application of what was required to provide context. And the statute on statute provisions were followed. Things that were changed were stricken. Things that were added were italicized. And again, the clear... Does that error void legislation? That error, Your Honor, is important in interpreting... I understand. But my question is, does it void legislation? Outside of the context of this case. In passing the statute that they meant to pass, they made this error. They didn't have the underlinings as they should have had. Would that void a new statute? Given the same context that we have with this case, Your Honor, I would say yes. And the context includes the statute that's passed seven years later that says they meant without? I'm not quite sure I follow. I guess what part of the context would change that? Well, Your Honor, the legislature felt all they were adding was just the word NAPPERPATH. And that's what they did. There's the rub. But it didn't. It added... It put back into the statute that which had been stricken down in best. Which they certainly had the power to do. Your Honor, I respectfully disagree with that. I would urge the court... That they could not reenact parts of the Tort Reform Act that were not, as Justice Thomas indicated earlier, that were kept on only because there was no severability in the act. This court requires them to do so with express intent. As evidenced by either the language of the statute itself or legislative history. So it didn't happen, Your Honor. It just didn't happen. I understand that's your argument, but you can understand other people are going to make an opposite argument. They passed what they passed for whatever reason they passed it. And the language is what the language is, and it's clear, which cuts off any further examination of legislative intent. I mean, that's the argument you're faced with. You can't get around U.S. Bank, Your Honor. Except that only... The argument is a valid one, but it doesn't apply to this situation. U.S. Bank was limited to repeal by implication. No, Your Honor. U.S. Bank addressed the requirement of how to reenact a statute that had been stricken. I would respectfully submit that to the court. Finally, Your Honor, I would ask the court to consider the fact that Carla Thompson had a life. She had a life that had value. It was wrongfully taken from her because of defendant's misdeeds. She was sent home after a botched tonsillectomy, cut and cauterized with a uvula. No physical protection against infection. Prescriptions ordered but not given. Her life had value. That was taken from her, even though she was a mentally retarded ward of the state who knows what advances might have improved her life. All she has left, Your Honor, is a next court date and a hope for some small measure of justice. I pray that you not take that from her. Thank you, Mr. Tancredi. Ms. Lister, rebuttal. Would you address the U.S. Bank issue? I would like to address U.S. Bank, Your Honors. We fully briefed this in our brief. The U.S. Bank is, as the Justice has properly indicated, is not applicable here. This case did not involve a repeal of a statute. In fact, the best court invited the legislature to reenact provisions of the Reform Act of 1995. And, of course, the legislature is said to know what case law and what provisions have been done in the way of the court system before they make it. This is not a U.S. Bank case. And I will tell you this, going through U.S. Bank, it's a confusion to me about preemption issues and all of that. I can't even begin to think about that part of it. But the point is, this is not an implicitly repealed situation. In fact, as has been pointed out from the bench, it is expressly not that. You have a situation where a best needed to throw the whole thing out because of the severability clause. And as a result, we end up with a statute which was reenacted. It's not implicitly repealed. And we strongly believe that reliance on U.S. Bank is completely misapplied. Are there any further questions? Thank you. Thank you. You have nothing further? I think you understand our positions. Everything's been fully briefed. And I'm happy to answer any other questions. Apparently there are none. Thank you, Ms. Lisher. Thank you, Mr. Inouye. And thank you, Mr. Tancredi. Case number 105050, Marjorie Okasik, as Special Administrator, versus the Children's Home and Aid Society of Illinois, is taken under advisement as agenda number 20.